Filed 12/29/25  McFadyen v. County of Tehama CA3

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Tehama)

----

| | |
|---|---|
| TROY MCFADYEN et al., | C100853 |
| Plaintiffs and Appellants, | (Super. Ct. No. 22CI000004) |
| v. | |
| COUNTY OF TEHAMA et al., | |
| Defendants and Respondents. | |

This civil action arises from a mass shooting in Tehama County.  In November 2017, Kevin Neal, a resident of Rancho Tehama Reserve, shot and killed his girlfriend.  The following day, Neal went on a shooting rampage in the community that resulted in the death of four people and injuries to at least 12 others.  Among the victims included several neighbors with whom Neal had a "long-running, violent feud."  A year later, in November 2018, individuals who were injured in the shooting and survivors of those who were killed (collectively, plaintiffs) brought suit in federal district court against the County of Tehama and others, alleging various state and federal causes of action, which

1

were largely predicated on the failure to prevent the mass shooting. After the district court dismissed the federal causes of action and plaintiffs decided not to amend them, plaintiffs commenced the instant action in Tehama County to pursue the state law causes of action. The stay of this action, which was imposed shortly after it was commenced, was lifted after the Ninth Circuit affirmed the dismissal order issued by the district court. (See *Phommathep v. County of Tehama* (9th Cir. 2023) 2023 U.S. App. Lexis 5503 (*Phommathep*).)

In this appeal, plaintiffs challenge the orders sustaining the demurrers to their state law causes of action without leave to amend, which were filed by the County Defendants[1] and Rancho Tehama Association (RTA or association), the homeowners association responsible for maintaining the neighborhood in which Neal and some of the mass shooting victims resided. With respect to the County Defendants, the trial court found the operative complaint failed to allege sufficient facts to establish the causation element of their causes of action (e.g., negligence/negligence per se), which were based on the failure of law enforcement to adequately investigate and arrest Neal for possessing guns and ammunition in violation of two restraining orders. As we shall explain, we conclude the trial court properly sustained the demurrers without leave to amend. Accordingly, we will affirm the judgment.

---

[1] The County Defendants include the County of Tehama, the Tehama County Sheriff's Office (TCSO), and two employees of the TCSO, Sheriff Dave Hencratt and Assistant Sheriff Phil Johnston.

# FACTUAL AND PROCEDURAL BACKGROUND

*Factual Background*

We summarize the facts underlying this action assuming, as we must, the truth of all properly pleaded allegations in the operative complaint.[2] (*Heckart v. A-1 Self Storage, Inc.* (2018) 4 Cal.5th 749, 753.)

*The Community and RTA*

At all relevant times in 2016 and 2017, Neal was a resident of Rancho Tehama Reserve, a rural community in Tehama County with a population of 2,100. Neal rented a home in a remote section of the community, which spread across 11.7 square miles, with his girlfriend Barbara Glisan.

RTA was the homeowners association for the neighborhood in which Neal and some of the mass shooting victims resided. Among other things, RTA was responsible for maintaining the "residence [l]ots" and common areas within the association, and for

---

[2] In support of their factual summary, the County Defendants characterize the operative complaint as containing "intentionally misleading and artfully pled" facts. According to the County Defendants, their appellate brief contains the "correct, non-editorialized, truthful, and material facts." They explain that they "have all of these facts because they have all the dated and time-stamped videos that exist, all the incident reports, and all the 911 emergency call audio and reports." They offer no authority suggesting that it is proper for us to rely on their factual summary in resolving this appeal. And while the record discloses that the County Defendants requested judicial notice of certain documents--e.g., Tehama County Computer-Aided Dispatch (CAD) Incident Report from January 31, 2017--the record does not reflect that the trial court granted their request. The County Defendants do not argue otherwise or request that we take judicial notice of any document on appeal. And no other party has filed a request for judicial notice.

We adhere to the applicable standard of review in resolving an appeal from an order sustaining a demurrer without leave to amend. (See *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [in reviewing a trial court's ruling sustaining a demurrer, our focus is limited to the facts alleged on the face of the pleading and its exhibits, and any facts subject to judicial notice].) Thus, to the extent the parties rely on "extraneous facts" outside the operative pleading, we do not consider those facts. (*Yamaha Motor Corp. v. Paseman* (1990) 219 Cal.App.3d 958, 963, fn. 2.)

promoting the health, safety, and welfare of the residents. As detailed *post*, for at least a year prior to the mass shooting, Neal was in a "violent feud" with several of his neighbors, including Diane Steele and her son, Danny Elliott II.

*Relevant Events Preceding the Mass Shooting*

In November 2016, Neal punched a female neighbor in the face and then fired several gunshots in her direction. The TCSO responded to this incident but did not arrest Neal. Later that same day, the TCSO went to Neal's home in response to a complaint from a neighbor (Steele) that Neal was yelling and shooting a gun. They left the area when Neal did not answer the door.

Less than two weeks later, RTA sent Neal a letter advising him of complaints about the " 'constant discharging of firearms continuously throughout the day and night' " on his property and the " 'constant yelling and threats to neighbors' " coming from his home. The letter also noted that "reports" were filed with the TCSO.

At some unspecified date in November 2016, the TCSO "contacted" Neal "directly" and informed him that there was a complaint about him yelling and shooting a gun. Neal admitted that he had been shooting a gun but claimed he was doing so in a "safe manner." The TCSO "closed the incident without follow-up" after Neal indicated that he would no longer shoot his guns at night and would "cut down" on shooting his guns during the day.

In January 2017 (approximately 10 months before the mass shooting), Steele and Elliott's girlfriend (Hailey Poland) were collecting firewood behind Neal's property when he shot at them six times with an "illegally modified" Bushmaster AR-15 assault rifle. Neal also punched Steele and stabbed Poland with a 10-inch knife. As a result of this incident, Neal was arrested and charged with multiple offenses, including assault with a deadly weapon, false imprisonment with violence, willful discharge of a firearm in a grossly negligent manner, battery, cruelty to a dependent adult [with] great bodily injury, robbery, and possession of an illegal firearm.

4

In February 2017, a criminal protective order was issued against Neal for the protection of Steele and Poland. Under the terms of that order, Neal was prohibited from possessing any gun or ammunition and was required to turn over any gun in his possession. Later that month, Neal's girlfriend (Glisan) contacted the TCSO and reported that she was missing a gun and that Neal was prohibited from possessing a gun under the terms of the criminal protective order. The TCSO "closed the case" after Glisan did not answer a phone call from its office.

In March 2017, a permanent (three-year) civil harassment restraining order was issued against Neal for the protection of Steele, Poland, Elliott, and other members of Steele's family. The terms of that order, like the criminal protective order, prohibited Neal from possessing any gun or ammunition.

Both the criminal protective order and civil harassment restraining order (collectively, restraining orders) included mandatory language requiring any police officer with knowledge of the order(s) to arrest Neal if he was found in possession of a gun or ammunition or if there was probable cause to believe he otherwise violated the terms of the order(s).

At some point in 2017, a civil harassment restraining order was issued against Elliott for the protection of Neal and Glisan. In late August 2017 and again in early October 2017, Neal and Glisan contacted the TCSO to report that Elliott had violated the terms of the restraining order.

On multiple occasions in 2017, Steele and Elliott contacted the TCSO to report violations of the restraining orders issued against Neal, including reports that Neal possessed guns and had been firing in a reckless manner on a regular basis, including at their home. The TCSO also received numerous complaints from other members of the community that Neal possessed guns and had been shooting at them and/or in a reckless manner on a regular basis.

5

According to plaintiffs, on one unspecified occasion after the restraining orders were issued against Neal but before the mass shooting (i.e., at some point between March 2017 and November 2017), Neal admitted he had been shooting a gun and officers from the TCSO observed him in possession of one or more guns. The TCSO, however, "did nothing to obtain a warrant to search Neal's premises or remove weapons from the hands of a clearly unstable and dangerous man."

Notably, this was the only in-person interaction between Neal and the TCSO after the restraining orders were issued against Neal in early 2017; the operative complaint does not identify any other occasion when an officer from the TCSO personally interacted with Neal or observed him shooting a gun. According to plaintiffs, Neal actively avoided (or evaded) officers from the TCSO "on the rare occasion [they] responded to the area"; Neal would stop shooting his gun before the officers arrived, dim his lights, and refuse to answer his door.

In November 2017, RTA sent another letter to Neal advising him that it had received numerous complaints about the " 'constant discharging of firearms" on his property and the "constant yelling and screaming" coming from his property. Like the prior letter sent in November 2016, RTA also noted that "reports" were filed with the TCSO.

Shortly before the mass shooting, unidentified members of Neal's family called the TCSO to report that he was mentally unstable, deteriorating, and unlawfully in possession of guns; the TCSO did not do anything in response to this report.

*The Mass Shooting*

On November 13, 2017, Neal shot and killed Glisan and hid her body under the floorboards of their home. The following morning, Neal shot and killed Steele and Elliott in their front yard. He then stole a truck and drove toward Rancho Tehama Elementary School, intending to kill Elliott's son. Although not entirely clear from the allegations in

6

the operative complaint, it appears that Neal shot and killed Joseph McHugh in connection with the theft of McHugh's truck.

As Neal was driving near Rancho Tehama Elementary School, he hit several cars and fired numerous gunshots at multiple people in three separate incidents.[3] In the first incident, Neal swerved into oncoming traffic and collided with a car containing a married couple, causing the couple's car to "go off into a drainage ditch." As the husband and his wife were getting out of their car, Neal approached on foot and fired numerous gunshots at them. Both were struck by bullets. The husband was seriously injured and his wife was killed.

In the second incident, Neal rear-ended a mother's car. He then fired numerous gunshots at the car's occupants as he drove by. The mother and two of her children were struck by bullets; they sustained severe injuries but survived. Another child sustained multiple injuries from debris including glass.

In the third incident, Neal rear-ended a car at a stop sign and then fired multiple gunshots at the occupants as he drove by. One of the gunshots struck the driver in the face, causing severe injuries. The passenger was not stuck by any bullet but suffered various injuries, including injuries to his face from "shrapnel."

Upon his arrival at the school, Neal was unable to enter the building because it had been locked down. He fired numerous gunshots at the building, two of which struck a student, A.H. He fled before police officers arrived; when later "cornered" by officers, he shot and killed himself.

*Allegations of Wrongdoing Against the TCSO and RTA*

Plaintiffs alleged the TCSO was aware that Neal continued to possess and shoot guns in a reckless manner "on a near daily basis" after the restraining orders were issued

---

[3] It is unclear from the allegations in the operative complaint as to the exact sequence of events on the day of the mass shooting.

in early 2017, which included shooting the rifle used in the January 2017 incident giving rise to the criminal protective order. The TCSO, in plaintiffs' view, willfully ignored or failed to adequately investigate and handle the various complaints (from at least nine different people) about Neal's "illegal, dangerous, and violent behavior," including, but not limited to, an August 2017 complaint by Steele that Neal was shooting a shotgun towards her home in violation of the criminal protective order, an October 2017 report by a neighbor complaining of gunshots and a woman screaming, a November 2017 report by a neighbor of yelling, screaming, and someone shooting in the area, and a November 2017 report by Steele about a female screaming for help. Similarly, plaintiffs fault RTA--alleged to have received numerous complaints about Neal's "constant" shooting of guns, yelling, and threats to neighbors--for failing to exercise reasonable care in addressing the danger posed by Neal.

In addition to the inadequate investigation of Neal's behavior, plaintiffs also alleged that the TCSO threatened to arrest persons (e.g., Steele, Elliott) who reported Neal's behavior, and that the TCSO "actively discouraged" other emergency assistance entities (e.g., CAL FIRE) from responding to calls regarding Neal. According to plaintiffs, the TCSO's conduct in ignoring credible reports and evidence that Neal was violating the terms of the restraining orders (e.g., numerous shell casings on Neal's property and bullet holes in his fence) implicitly endorsed Neal's dangerous conduct and/or emboldened and encouraged Neal to continue "terroriz[ing]" the community with his dangerous behavior without any consequences. In plaintiffs' view, had the TCSO properly responded to the complaints about Neal's behavior, there would have been probable cause to search Neal's property and arrest him for possessing guns and ammunition in violation of the restraining orders. Plaintiffs further assert that, had Neal been arrested, "he likely would have remained in jail on November 14, 2017, such that he would not have been able to kill and injure so many people" with one or more guns he could not legally possess.

8

*Procedural Background*

    *Federal Action*

In November 2018, plaintiffs brought suit against the County Defendants and RTA in federal district court. (See *Phommathep, supra,* 2023 U.S. App. Lexis 5503; *McFadyen v. County of Tehama* (E.D. Cal. 2021) 2021 U.S. Dist. Lexis 168080 (*McFadyen*).) Collectively, plaintiffs filed six separate civil actions, which alleged various state and federal causes of action against the County Defendants and RTA. (*Phommathep,* at p. *2, fn. 1; see, e.g., *McFadyen v. County of Tehama* (E.D. Cal. 2020) 2020 U.S. Dist. Lexis 138865.)

After the district court granted the County Defendants' motion to dismiss the federal causes of action (which were not alleged against RTA), plaintiffs filed amended complaints in September 2020. (See *McFadyen, supra*, U.S. Dist. Lexis 168080.) Among other things, the amended complaints asserted three federal civil rights causes of action against the County Defendants under 42 U.S.C. § 1983: (1) the County Defendants violated plaintiffs' right to due process by enhancing the danger that the perpetrator of the shooting (Neal) presented to them; (2) the County Defendants withheld law enforcement services from plaintiffs in violation of the Equal Protection Clause of the Fourteenth Amendment; and (3) the County Defendants inadequately trained and supervised their officers, thus creating municipal liability under *Monell v. Department of Social Services of New York* (1978) 436 U.S. 658. (See *Phommathep,* 2023 U.S. App. Lexis 5503, at p. *2; *McFadyen, supra*, U.S. Dist. Lexis 168080, at p. *2.) In response, the County Defendants and RTA each filed a motion to dismiss. (*McFadyen,* at p. *3.)

In September 2021, the district court granted the County Defendants' motion as to the federal causes of action and denied RTA's motion as moot. (*Phommathep,* 2003 U.S. App. Lexis 5503, at p. *3; see *McFadyen, supra*, U.S. Dist. Lexis 168080, at p. *22.) In so ruling, the district court declined to exercise supplemental jurisdiction over the remaining state law causes of action, and therefore did not decide whether dismissal of

9

those claims--e.g., negligence/negligence per se against the County Defendants, negligence/negligent premises liability against RTA--was warranted. (*McFadyen, supra*, U.S. Dist. Lexis 168080, at pp. *23, 24.)

In March 2023, the Ninth Circuit affirmed the district court's dismissal order in an unpublished memorandum disposition. (*Phommathep, supra*, 2023 U.S. App. Lexis 5503.) As for the due process cause of action, the Ninth Circuit found that plaintiffs had failed to state an actionable claim under the "state-created danger doctrine," which holds that a state may be held liable for failing to protect an individual against private violence when " 'government employees "affirmatively place the plaintiff in a position of danger, that is, where their actions create or expose an individual to a danger which he or she would not have otherwise faced." ' " (*Id.* at p. *3.) In so finding, the Ninth Circuit reasoned as follows: "Plaintiffs argue that their complaint alleges two affirmative acts that increased the risk that Neal posed to his neighbors. First, when responding to a call from Neal's neighbors, [the County] Defendants allegedly told Neal that he could 'continue to own and discharge firearms in the community.' Second, in other conversations with Neal, [the County] Defendants allegedly declined to investigate illegal firearm use by his neighbors. Plaintiffs claim these statements 'communicated to Neal, both explicitly . . . and implicitly, that he could recklessly use and/or unlawfully possess firearms with impunity.' [¶] Neither interaction constitutes an affirmative act." "Here, Plaintiffs have only pleaded that [the County] Defendants told Neal that they would not arrest him or his neighbors for their firearm use. Without additional supporting facts, declining to arrest an individual does not constitute an affirmative act." (*Id*. at pp. *4-5.) The Ninth Circuit further concluded that plaintiffs had "failed to plead a causal link between their injuries and [the County] Defendants' conduct." (*Id*. at p. *5 [explaining that, to plead a claim of state-created danger, a plaintiff must show that a government employee took an affirmative act that was the but-for cause of the alleged injuries].) In reaching this conclusion, the Ninth Circuit stated: "Here, Plaintiffs have—at most—

10

alleged that [the County] Defendants' statements to Neal led him to believe that he would not be arrested for reckless firearm use on and around his property. But Plaintiffs were not injured by Neal's reckless firearm use on or around his property. Instead, they were injured by his intentionally violent acts throughout his surrounding community. Without facts that connect [the County] Defendants' affirmative acts to the conduct that caused Plaintiffs' injuries, [Plaintiffs'] claim fails for want of a causal link." (*Id*. at p. *6.)

In finding that plaintiffs had failed to state an actionable equal protection claim, the Ninth Circuit found that the plaintiffs' "conclusory allegations are insufficient to state a claim." (*Phommathep, supra*, 2023 U.S. App. Lexis 5503, at p. *7.)

The Ninth Circuit then found that because the plaintiffs' underlying constitutional claims failed, so too did their *Monell* (municipal liability) claim, which was dependent on their constitutional claims. (*Phommathep, supra*, 2023 U.S. App. Lexis 5503, at p. *7.)

*Instant State Court Action*

After the district court dismissed plaintiffs' federal causes of action in September 2021, they elected not to amend those claims and instead asked the district court to enter final judgment so they could appeal the dismissal order to the Ninth Circuit. (*Phommathep, supra*, 2023 U.S. App. Lexis 5503.) Thereafter, plaintiffs commenced the instant state court action in Tehama County against the County Defendants and RTA. Pursuant to the parties' stipulation, the action was stayed pending the outcome of the appeal before the Ninth Circuit.

After the Ninth Circuit affirmed the district court's dismissal order in March 2023, plaintiffs filed a first amended (operative) complaint in this action. It alleged five state law causes of action: (1) failure to perform a mandatory duty in violation of Government Code section 815.6 against the County Defendants; (2) negligent supervision, training, retention, and ratification against the County Defendants; (3) negligence/negligence per se against the County Defendants; (4) negligence/negligent premises liability against RTA; and (5) public and private nuisance against the County Defendants and RTA.

11

In October 2023, the County Defendants and RTA each filed a demurrer, arguing that plaintiffs had failed to state an actionable claim for relief. Plaintiffs opposed the demurrers.

In February 2024, after a hearing, the trial court issued an order sustaining the County Defendants' demurrer without leave to amend. As for the first cause of action--failure to perform a mandatory duty in violation of Government Code section 815.6--the court found that while plaintiffs had identified a mandatory duty under Penal Code section 836, subdivision (c) (which, in plaintiffs' view, required the TCSO to arrest Neal for possessing guns and ammunition in violation of the restraining orders), dismissal was nonetheless warranted because plaintiffs failed to allege sufficient facts establishing that the "breach of said duty [was] the proximate cause of the injuries suffered." For the same reason (failure to plead sufficient facts to establish proximate cause), the court sustained the County Defendants' demurrer to the second cause of action--negligent supervision, training, retention, and ratification--and the third cause of action--negligence/negligence per se. Finally, as for the fifth cause of action--public and private nuisance--the court found that because plaintiffs' negligence and nuisance claims relied on the same facts about lack of due care, the nuisance claim was akin to a negligence claim and therefore failed as a matter of law because plaintiffs did not allege facts establishing the causation element; namely, that the County Defendants' conduct was a substantial factor in causing the alleged harm.

In a separate order issued on the same day, the trial court sustained RTA's demurrer without leave to amend. As for the fourth (negligence/negligent premises liability) and fifth causes of action (public and private nuisance) the court found that these claims failed as a matter of law for failure to allege sufficient facts to establish the duty element of the negligence claim and the causation element of the nuisance claim. In so ruling, the court rejected plaintiffs' reliance on cases involving landlord liability,

12

finding (among other things) that RTA was neither a landlord nor functioning as a landlord.

Plaintiffs timely appealed. The matter was fully briefed and assigned to this panel in September 2025.

## DISCUSSION

### I

### *Standard of Review*

A demurrer tests the legal sufficiency of the factual allegations in a complaint. (*SJJC Aviation Services, LLC v. City of San Jose* (2017) 12 Cal.App.5th 1043, 1051-1052.) On appeal from a judgment of dismissal based on an order sustaining a demurrer, we apply a de novo standard of review; we exercise our independent judgment about whether the pleading sufficiently states a viable cause of action under any legal theory. (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1100; *Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42; *Dilbert v. Newsom* (2024) 101 Cal.App.5th 317, 322.)

In determining whether a demurrer was properly sustained, we accept as true "all facts properly pleaded by the plaintiffs, as well as those that are judicially noticeable." (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 814.) However, we do not assume the truth of contentions, deductions, or conclusions of fact or law. (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924.) We read the challenged pleading as a whole and its parts in their context to give the pleading a reasonable interpretation. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6.) " ' "We affirm [the judgment] if any ground offered in support of the demurrer was well taken. . . . We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale." ' " (*Ramirez v. Tulare County Dist. Attorney's Office* (2017) 9 Cal.App.5th 911, 924.)

13

When a trial court has sustained a demurrer without leave to amend, we must "decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; see also *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.) Such a showing can be made for the first time on appeal. (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 711.) "The plaintiff has the burden of proving that an amendment would cure the defect." (*Schifando*, at p. 1081; *Blank*, at p. 318.) To meet this burden, a plaintiff "must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading." (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349.)

II

*County Defendants' Demurrer*

As previously indicated, the operative complaint alleged four causes of action against the County Defendants--first (violation of mandatory duty), second (negligent supervision, training, retention, and ratification), third (negligence/negligence per se), and fifth (public and private nuisance). The trial court sustained the County Defendants' demurrer as to each of those causes of action without leave to amend on the ground that plaintiffs failed to allege sufficient facts to establish the causation element. On appeal, plaintiffs challenge the ruling as to each cause of action, which we discuss in turn next.

A. *First Cause of Action: Failure to Perform Mandatory Duty*

Plaintiffs argue the trial court erred in sustaining the County Defendants' demurrer to their first cause of action, which predicated governmental liability on the alleged failure to comply with a mandatory statutory duty in violation of Government Code section 815.6. Plaintiffs insist that, contrary to the court's determination, they alleged sufficient facts establishing that the breach of the mandatory duty under Penal Code section 836, subdivision (c)--failure to arrest Neal for possessing guns and ammunition in

14

violation of the restraining orders when probable cause existed to do so--was a proximate cause of the injuries alleged.  Plaintiffs claim reversal is required because proximate cause is a question of fact for the jury, as reasonable minds could reach a different conclusion on the issue of causation.  We are not persuaded.

### 1. *Additional Background*

Government Code section 815.6 provides:  "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

The mandatory duty relied upon by plaintiffs is found in Penal Code section 836.  Subdivision (c)(1) of section 836 provides, in relevant part:  "When a peace officer is responding to a call alleging a violation of a . . . restraining order . . . and the peace officer has probable cause to believe that the person against whom the order is issued has notice of the order and has committed an act in violation of the order, the officer *shall . . .* make a lawful arrest of the person without a warrant and take that person into custody whether or not the violation occurred in the presence of the arresting officer. . . ."  (Italics added.)

In support of their first cause of action, plaintiffs alleged that the County Defendants had a mandatory duty to arrest Neal based on the existence of probable cause to believe he was in possession of guns and ammunition in violation of the restraining orders.  According to plaintiffs, the County Defendants breached their mandatory duty "by acting with deliberate indifference in refusing to take any action to arrest Neal despite ammunition littering [his] property in plain view from the road, repeated complaints that [he] was in possession of and was discharging firearms, in direct violation of the [restraining orders] . . ."  Plaintiffs further alleged that, as a direct, proximate, and foreseeable result of the County Defendants' conduct, Elliott, Steele, and

15

others were shot and killed or severely injured during the mass shooting committed by Neal.

## 2. *Relevant Legal Principles*

"Under the Government Claims Act (Gov. Code, § 810 et seq.), there is no common law tort liability for public entities in California; instead, such liability must be based on statute." (*Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 897; see Gov. Code, § 815, subd. (a) [except as otherwise provided by statute, "A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person"].)

One such statute is Government Code section 815.6, which, as noted *ante*, provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." "Thus, the government may be liable when (1) a mandatory duty is imposed by enactment, (2) the duty was designed to protect against the kind of injury allegedly suffered, and (3) breach of the duty proximately caused injury." (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 348 (*State Hospitals*); see also *B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 179.) Here, we are only concerned with the third or proximate cause element.

There can be no tort liability for a public entity unless the breach of the mandatory duty proximately caused plaintiff's injury. (*Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 499-500.) Proximate cause is a "a flexible concept" that "generally 'refers to the basic requirement that . . . there must be "some direct relation between the injury asserted and the injurious conduct alleged," ' [citations]. . . . Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct. [Citation.] A requirement of proximate cause thus serves, *inter alia*, to

16

preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." (*Paroline v. U.S.* (2014) 572 U.S. 434, 444-445.)

Proximate cause is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produced the injury complained of and without which such result would not have occurred. (*Walt Rankin & Associates, Inc. v. City of Murrieta* (2000) 84 Cal.App.4th 605, 626.) Our Supreme Court has explained that the proximate cause requirement has two components: cause in fact (also called actual or direct causation), and public policy considerations that are held to limit an actor's liability for the consequences of his conduct. (*People v. Carney* (2023) 14 Cal.5th 1130, 1138; *State Hospitals, supra,* 61 Cal.4th at pp. 352-353; see *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1235, fn. 1 ["Causation analysis in tort law generally proceeds in two stages: determining cause in fact and considering various policy factors that may preclude imposition of liability"].)

Here, we focus on the cause in fact component of proximate cause. " ' " 'An act is a cause in fact if it is a necessary antecedent of an event' " ' " [citations], and it is commonly referred to as the 'but-for' cause . . ." (*People v. Carney*, *supra*, 14 Cal.5th at p. 1138; see also *State Hospitals, supra*, 61 Cal.4th at p. 352.) Determining whether a defendant's negligent act is an actual cause or "a necessary antecedent" of a plaintiff's injury requires us to ascertain whether "but for" the defendant's negligence, plaintiff's injury would have been avoided. (*State Hospitals,* at p. 352, fn. 12; see *Paroline v. U.S., supra*, 572 U.S. at p. 444 [explaining that an event is a cause in fact of another if the former event caused the latter, which involves a " 'matter-of-fact inquiry into the existence . . . of a causal relation as laypeople would view it' "].) " 'As a matter of practical necessity, legal responsibility must be limited to those causes which are so close to the result, or of such significance as causes, that the law is justified in making the

17

defendant pay.' " (*Kumaraperu v. Feldsted* (2015) 237 Cal.App.4th 60, 68 (*Kumaraperu*).)

Where there are multiple causes that arguably contribute to an injury or harm, courts apply the "substantial factor" test, which subsumes traditional "but for" causation. (*State Hospitals, supra*, 61 Cal.4th at p. 352, fn. 12; see also *In re Ethan C.* (2012) 54 Cal.4th 610, 640.) "Under that standard, a cause in fact is something that is a substantial factor in bringing about the injury." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 969; see also *In re Ethan C.,* at p. 640.)

"Generally, a defendant's conduct is a substantial factor if the injury would not have occurred but for the defendant's conduct. [Citation.] If the injury ' "would have happened anyway, whether the defendant was negligent or not, then his or her negligence was not a cause in fact, and of course cannot be the legal or responsible cause." ' [Citations.] As our high court has explained, ' "a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor." ' " (*Grotheer v. Escape Adventures, Inc.* (2017) 14 Cal.App.5th 1283, 1303; see *Kumaraperu*, *supra*, 237 Cal.App.4th at p. 68 [for "causation in fact," the conduct must be a "substantial factor" bringing about harm that "is 'recognizable as having an appreciable effect in bringing it about' "].) "A defendant's negligent conduct may combine with another factor to cause harm; if a defendant's negligence was a substantial factor in causing the plaintiff's harm, then the defendant is responsible for the harm; a defendant cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing the plaintiff's harm; but conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." (*Yanez v. Plummer* (2013) 221 Cal.App.4th 180, 187.)

The purpose of the cause in fact (or "but-for") requirement is "to safeguard against speculative and conjectural claims." (*State Hospitals*, *supra*, 61 Cal.4th at p. 356.) Ultimately, "[c]ausation in fact is . . . 'a matter of probability and common sense.'

18

[Citation.] 'If, as a matter of ordinary experience, a particular act or omission might be expected to produce a particular result, and if that result has in fact followed, the conclusion may be justified that the causal relation exists." (*Kumaraperu*, *supra*, 237 Cal.App.4th at p. 69 [explaining that "a defendant owes no duty to prevent a harm that was not a reasonably foreseeable result of his negligent conduct"].) However, a defendant is not liable for harm when the tortious aspect of the defendant's conduct " 'was of a type that does not generally increase the risk of [the plaintiff's] harm.' " (*Shih v. Starbucks Corp.* (2020) 53 Cal.App.5th 1063, 1069; see *State Hospitals, supra*, 61 Cal.4th at p. 359 (conc. opn. of Werdegar, J.) ["coincidental causation—an allegation that some breach created an opportunity for an injury to occur, without increasing the risk of that injury occurring—is insufficient"].)

" 'Ordinarily, proximate cause is a question of fact which cannot be decided as a matter of law from the allegations of a complaint. . . . Nevertheless, where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact.' " (*State Hospitals, supra,* 61 Cal.4th at p. 353.)

As we next explain, this case presents a factual scenario that allows us to decide the question of proximate cause as a matter of law. In resolving this issue, we assume, without deciding, that there was a failure to perform (or breach of) a mandatory duty.

### 3. *Analysis*

We see no error in the trial court's decision to sustain the County Defendants' demurrer. In reaching this conclusion, we find the analysis in *State Hospitals* instructive. In that case, which involved the rape and murder of a victim four days after an inmate was released from prison, our Supreme Court concluded that a demurrer had been properly sustained with regard to a claim alleging the failure of state actors to perform a mandatory duty under the Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.), which authorizes the involuntary civil commitment of persons deemed to be sexually violent predators after they have completed their prison term. (*State*

19

*Hospitals, supra*, 61 Cal.4th at pp. 343-344, 356.) The question in *State Hospitals* was whether proximate cause could be established where the plaintiff alleged that had the State Department of Mental Health (DMH) complied with the procedure mandated by the SVPA to determine if the inmate was likely to be a sexually violent predator--a full evaluation by *two* psychologists or psychiatrists, or *one of each*--that evaluation process would have resulted in a referral by DMH for civil commitment, and ultimately civil commitment, not release. (*Id*. at pp. 346-347.) The *State Hospitals* court concluded that the chain of intervening discretionary acts that occurred after the breach of the asserted mandatory duty under the SVPA (DMH's failure to conduct a second evaluation) but before the rape and murder were fatal to the plaintiff's claim. (*Id*. at p. 356.) In so concluding, the high court explained: "The only mandatory duty established by the complaint's allegations is the duty to use two evaluators; the details of the *manner* in which each evaluator conducts the review are discretionary, so long as they include the statutory criteria. Thus, no actionable breach of duty can be found in the single evaluator's failure to conclude that [the prisoner] was an SVP. Nor can plaintiff hypothesize a positive finding by that evaluator as a link in the chain of proximate causation. Instead, she must posit a subsequent unbroken series of discretionary findings contradicting the first evaluator's conclusion and leading to civil commitment . . . . Plaintiff's showing of 'but for' causation is weak, because with each step in the review process the results become more speculative." (*Id*. at pp. 355-356.)

In concluding that the plaintiff had not alleged proximate cause as a matter of law, *State Hospitals* discussed a series of cases decided at the pleading stage, all of which held that proximate cause was not established when a governmental defendant's failure to act allegedly caused injury because the chain of causation included discretionary determinations for which no liability could be imposed. (See *State Hospitals, supra*, 61 Cal.4th at pp. 353-355.) In the most recent case in this line of authority, *Fleming v. State of California* (1995) 34 Cal.App.4th 1378, a parolee committed murder and the victim's

20

family alleged that the parole officer had breached a mandatory duty to arrest the killer for a parole violation (failure to remain within California). (*Id*. at pp. 1381-1382.) In affirming the order sustaining the parole officer's demurrer, the *Fleming* court explained that the failure to arrest "was not itself a cause of the injury, since arrest without a period of incarceration would not necessarily have prevented the crime. Incarceration, however, would have involved procedural steps involving the exercise of discretion and thus have broken the causal chain." (*Id*. at p. 1384.)

In *State of California v. Superior Court* (1984) 150 Cal.App.3d 848 (*Perry*), the plaintiffs brought suit against the state and others alleging they were defrauded by a property manager licensed by the Department of Real Estate. Plaintiffs claimed that the Real Estate Commissioner breached his mandatory duty to investigate a prior fraud complaint against the manager. (*Id*. at p. 852.) The *Perry* court found that the commissioner had a mandatory duty to investigate complaints (*id*. at pp. 855-856), but held the plaintiffs could not establish that the alleged breach was the proximate cause of their loss. In so holding, the court explained: "[E]ven had the commissioner used due care to investigate the . . . complaint, and had discovered . . . wrongdoing, there is no reasonable assurance that sanctions would have been imposed that would have prevented plaintiffs' subsequent losses. . . . The commissioner's mandatory statutory duty to 'investigate' the . . . complaint may not reasonably be read as imposing a mandatory duty . . . to *take action* in the event the . . . investigation disclose[d] evidence of wrongdoing. Indeed, the Business and Professions Code specifically allows the commissioner discretion as to what action, if any, he deems appropriate to deal with transgressing licensees." (*Id*. at pp. 857-858.) After citing several statutory provisions that made it clear that the commissioner retained the discretionary power to pursue disciplinary measures against a licensee, the *Perry* court stated: "Moreover, [the commissioner] cannot act unilaterally to suspend or revoke a license; rather, suspension or revocation can occur only following a formal adjudicatory process at which accusations have to be

21

proved by the Department of Real Estate. . . . In addition, had the accusations been sustained, and had the commissioner exercised his discretionary power to impose discipline [citation], that discipline could have been in the form of a license suspension for as little as 15 days [citation]—a penalty that would not have had any obvious effect on plaintiffs' losses. [¶] In short, several procedural steps lie between an initial investigation that discloses evidence of wrongdoing and any eventual imposition of effective sanctions against an offending real estate agent. The causal link is thus tenuous at best." (*Id*. at pp. 858-859, fns. omitted.)

The third case in this line of authority discussed by *State Hospitals* was *Whitcombe v. County of Yolo* (1977) 73 Cal.App.3d 698. There, the plaintiffs were physically assaulted by a probationer who had been diagnosed with several mental disorders. (*Id*. at pp. 702-703.) The plaintiffs sued the county and others, including the probation department, under Government Code section 815.6, claiming that they breached their mandatory duties of investigating and reporting probation violations to the trial court. (*Whitcombe*, at p. 703.) In finding that the defendants' demurrer was properly sustained, the *Whitcombe* court explained that even had the county satisfied its obligations, the trial court could have, in its discretion, declined to revoke the probationer's probation. (*Id*. at p. 708.) As a result, the court concluded "the requirement of section 815.6 that the injury be proximately caused by the failure to discharge the duty, is not satisfied." (*Ibid*.)

On this record, we conclude the trial court properly determined that the alleged breach of a mandatory duty by the County Defendants--the failure of the TCSO to arrest Neal for possessing guns and/or ammunition in violation of the restraining orders--was not itself the legal or proximate cause of the injuries inflicted by Neal during the mass shooting. As the Ninth Circuit explained in its order affirming the dismissal of plaintiffs' federal causes of action, the operative complaint alleged conduct that, at most, led Neal to believe that he would not be arrested for reckless firearm use on and around his property.

(*Phommathep, supra*, 2023 U.S. App. Lexis 5503, at p. *6.) But plaintiffs were not injured by such conduct. Instead, they suffered injuries as a consequence of Neal's deadly shooting rampage throughout the community. Absent facts that connect the County Defendants' affirmative acts or omissions with the conduct that caused the injuries, plaintiffs' claim fails as a matter of law for lack of a causal link. Indeed, as in *Fleming*, arrest of Neal without a period of incarceration would not have prevented the shooting. And incarcerating Neal would have included procedural steps involving the exercise of discretion, thereby breaking the causal chain between failing to arrest Neal and the harm suffered by plaintiffs. (See *Fleming v. State of California, supra,* 34 Cal.App.4th at p. 1384; *Whitcombe v. County of Yolo*, *supra*, 73 Cal.App.3d at p. 708.) The facts pleaded in the operative complaint are legally insufficient to connect the breach of a mandatory duty with the injuries alleged. There is no direct relation between Neal's possession of guns and ammunition in violation of the restraining orders and the mass shooting. Because the alleged facts do not establish the cause in fact component of proximate causation, the County Defendants' demurrer to the first cause of action was properly sustained.

In urging a contrary result, plaintiffs primarily rely on five cases, including two cases that analyze causation in the context of a statutory duty to report child abuse. In each of those cases, proximate cause was found to be a question of fact for the jury. In *Landeros v. Flood* (1976) 17 Cal.3d 399, the minor plaintiff brought negligence claims against a physician and the hospital that employed him, alleging that they negligently failed to diagnose her with battered child syndrome when she was 11 months old, which resulted in her release from the hospital and return to her mother and her mother's husband, who continued to abuse her. (*Id*. at pp. 405-406.) Plaintiff claimed that had the defendants properly diagnosed her, they would have been required to "report[ ] her injuries to local law enforcement authorities or juvenile probation department [under the Penal Code]. Such a report would have resulted in an investigation by the concerned

23

agencies, followed by a placement of [the] plaintiff in protective custody until her safety was assured." (*Id*. at p. 406.) In concluding that proximate cause could not be determined as a matter of law, our Supreme Court stated: "We cannot say categorically that an ordinarily prudent physician who had correctly diagnosed that plaintiff was a victim of the battered child syndrome would not have foreseen the likelihood of further serious injuries to her if she were returned directly to the custody of her caretakers." (*Landeros*, at p. 412.) The *Landeros* court ruled that the plaintiff was "entitled to prove by expert testimony that defendants should reasonably have foreseen that her caretakers were likely to resume their physical abuse and inflict further injuries on her if she were returned directly to their custody." (*Ibid*.) In so ruling, the high court explained that because battered child syndrome included among its "distinguishing characteristics" the likelihood "that the assault on the victim is not an isolated, atypical event but part of an environmental mosaic of repeated beatings and abuse," the trial court "could not properly rule as a matter of law that the defendants' negligence was not the proximate cause of plaintiff's injuries. (*Ibid*.)

The same conclusion was reached in *Alejo v. City of Alhambra* (1999) 75 Cal.App.4th 1180, which also involved an allegation of child abuse. In *Alejo*, the plaintiff's father told the police that plaintiff's mother and her boyfriend were using drugs and that mother's boyfriend was beating plaintiff, who was three years old and had a black eye. (*Id*. at p. 1183.) The police failed to investigate and failed to report the alleged abuse to other government agencies. Six weeks later, the boyfriend severely beat the plaintiff, leaving him permanently disabled. The plaintiff brought a negligence claim against the City of Alhambra and the police officer who had received the report, alleging they had failed to investigate or report a reasonable suspicion of child abuse in violation of a statutory mandate. (*Id*. at pp. 1183-1184.) Relying on *Landeros*, the *Alejo* court concluded that plaintiff was "entitled to prove by way of expert testimony a reasonably prudent social worker would have responded to the alleged facts of his abuse in a way

24

which would have prevented his subsequent injuries. Considering the allegations . . ., such as the physical abuse suffered by [the plaintiff], his black eye and the drug use by his mother and [her boyfriend], it [was] not difficult to believe the county welfare department would have taken affirmative steps to protect [the plaintiff]. Whether or not the department would have done so is not a matter of speculation but a question of fact to be determined at trial through expert testimony." (*Id*. at p. 1192.) While *Alejo* was later disapproved of on another ground by our Supreme Court in *B.H.*, its causation analysis remains good law. Indeed, the *B.H.* court observed that " 'the Legislature [has] recognized case law that ha[s] permitted a civil suit for injury to a child where there was a breach of the mandated reporter's duty to report child abuse.' " (*B.H. v. County of San Bernadino, supra*, 62 Cal.4th at pp. 187-188, fn. 6.) In *B.H.*, the court explained that the Legislature enacted the statute at issue in *Landeros* and *Alejo* to foster cooperation between child protective agencies and persons required to report child abuse (e.g., police officers) to " 'insure that children will receive the collective judgment of all such agencies and persons regarding the course to be taken to protect the child's interest.' " (*B.H.*, at pp. 182-183.)

In addition to the child abuse cases, plaintiffs also rely on two cases involving the failure of a government actor to prevent a person from accessing a gun. In *Braman v. State of California* (1994) 28 Cal.App.4th 344, a widow whose husband committed suicide brought a wrongful death action against the state. The husband had a history of mental illness and had been deemed "a danger to himself and to others" under California law. (*Id*. at 347.) He nonetheless bought a gun that he used to fatally shoot himself. Pursuant to California's Dangerous Weapons Control Act, the husband waited 15 days to take possession of the gun. (*Ibid*.) During the waiting period, the statute obligated the state to conduct a background check to determine whether the husband was eligible to purchase a gun. (*Id*. at p. 348.) The widow alleged that the state failed to perform its mandatory duties under the statute as her husband was clearly ineligible because of his

25

mental illness, and that it was because of the failure to investigate that her husband had the gun with which he killed himself. (*Id*. at p. 356.) The *Braman* court concluded that the widow's claim raised sufficient questions of fact as to proximate cause and reversed the trial court's grant of summary judgment for the state. (*Ibid*.) In finding that the state's failure to conduct a proper background check could have led to the husband's possession of the gun, the court relied on the legislative history underlying the statutory scheme, which demonstrated that the legislature intended to prevent persons like husband from having access to guns. (*Id*. at pp. 352-353.) Given that the statute was effectively predicated on a causation theory similar to the widow's, the court determined that she had stated an actionable claim for relief. (*Id*. at p. 356 [explaining that the statutory scheme at issue "rest[ed] on the premise that if the wrong people get guns they will use them," and that by "tying" the state's duty under the relevant penal code provision--i.e., halting the sale of firearms to persons who have a documented history of posing a danger to themselves or others--to the California Tort Claims Act, "the Legislature clearly contemplated that nonperformance of the former would give rise to liability under the latter"].)

The same result was reached in *Vickers v. U.S*. (2000) 228 F.3d 944, a case that also involved a fatal shooting. In *Vickers*, the Ninth Circuit determined that it was a question of fact for the jury to decide whether the Immigration and Naturalization Service's (INS) failure to investigate and take away a detention officer's service-issued gun was a cause of the officer's shooting of his wife. (*Id*. at pp. 955-956.) The shooting occurred after the officer had engaged in serious misconduct, including using his gun to shoot at his girlfriend during an argument. (*Id*. at pp. 947-948.) The officer was reassigned to work as a file clerk and had his gun taken away pending termination proceedings. (*Id*. at p. 948.) A year later, while the termination proceedings were still pending, the officer was restored to duty and reissued his gun. (*Ibid*.) He then used the gun to shoot and kill his wife. (*Ibid*.) In reversing a grant of summary judgment, the

Ninth Circuit concluded there was a triable issue of material fact as to whether the INS's failure to investigate and withhold reissuance of the gun was a substantial factor in increasing the likelihood that the officer would shoot his wife. (*Id*. at pp. 955-956.) The theory of causation was that a proper investigation of the shooting incident would have resulted in a refusal to reissue the gun to the officer, and that, if the gun had not been reissued, then the wife would not have been shot. (*Id*. at p. 954.)

Lastly, plaintiffs rely on *Henderson v. Newport–Mesa Unified School Dist*. (2013) 214 Cal.App.4th 478. In that case, a teacher brought an action to challenge (among other things) the failure of a school district to rehire her on a "first priority" basis when it decided to fill a vacant position in the subject matter she had previously taught. (*Id*. at p. 484.) The teacher sued the school district and its governing board (collectively, District) under Government Code section 815.6, claiming that the District breached its mandatory duty under Education Code section 44918 to accord temporary teachers such as her "first priority" in hiring under specified circumstances. (*Henderson*, at p. 484.) In reversing, the appellate court found that, contrary to the trial court's determination, the teacher had alleged sufficient facts to survive a demurrer. The appellate court addressed the issue of proximate cause as follows: "[Teacher] specifically alleged that District advertised three available positions for the 2010-2011 school year—one full time position and two part-time positions which combined would equal a full-time position—teaching the same subjects at the same grade-level she had previously taught, and then filled those available positions with candidates who were both new to the district and had less experience than she did. Those allegations, if proved, are sufficient to demonstrate the District's alleged failure to comply with its mandatory obligation to accord [teacher] "first priority" in filling these available positions was the proximate cause of her not being rehired by the District for the 2009-2010 school year." (*Id*. at p. 497.) The *Henderson* court explained that the mere fact that the statute at issue gave the teacher no ultimate guarantee of

27

employment did not mean that the duty imposed on the District to give her "first priority" was a discretionary one (as opposed to a mandatory one). (*Ibid.*)

We find the cases relied upon by plaintiffs to be distinguishable and therefore unpersuasive. (See *State Hospitals, supra*, 61 Cal.4th at p. 356, fn. 16 [finding plaintiff's reliance on *Landeros*, *Henderson*, *Alejo*, and *Braman* unavailing because none of those cases involved a showing of proximate cause founded on a series of discretionary determinations comparable to the scenario set out in plaintiff's complaint].) In our view, the material facts of this case are more analogous to those alleged in *State Hospitals, Fleming, Perry,* and *Whitcombe*, all of which involved the upholding of a demurrer to a cause of action under Government Code section 815.6. Here, like in those cases, the factual allegations in the operative complaint are legally insufficient to connect the County Defendants' breach of a mandatory duty with the injuries inflicted by Neal during the mass shooting. As discussed, *ante*, the arrest of Neal for unlawful possession of a gun and/or ammunition in violation of the restraining orders would have been only the first step in a necessary chain of discretionary actions, which would have had to culminate in the incarceration of Neal in order for the injuries to have been prevented. Indeed, even if Neal were arrested for violating the terms of the restraining orders, there would have been several procedural steps between his arrest and incarceration. The alleged connection between the County Defendants' conduct and the injuries suffered by plaintiffs is too attenuated or remote to satisfy the element of proximate causation, as there is no direct relation between the injuries asserted and the failure to arrest Neal for violating the terms of the restraining orders.

B. *Remaining Causes of Action*

The remainder of plaintiffs' causes of action against the County Defendants fail for the same reasons that their first cause of action fails--the absence of sufficient facts to show proximate cause. Plaintiffs' second and third causes of action are negligence claims, which include the necessary element of proximate cause. (See, inter alia,

*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*); *State Hospitals, supra*, 61 Cal.4th at p. 352, fn. 11; *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 876. The same is true of plaintiffs' fifth cause of action for public and private nuisance. (See *People v. ConAgra Grocery Products Co.* (2017) 17 Cal.App.5th 51, 101-102 ["the causation element of a public nuisance cause of action is satisfied if the conduct of a defendant is a substantial factor in bringing about the result"]; *Melton v. Boustred* (2010) 183 Cal.App.4th 521, 542 (*Melton*) ["The elements 'of a cause of action for public nuisance include the existence of a duty and causation' "]; *El Escorial Owners' Assn. v. DLC Plastering, Inc.* (2007) 154 Cal.App.4th 1337, 1349 [when the alleged nuisance is the result of the defendant's alleged negligent conduct and the cause of action relies on the same facts about lack of due care, the nuisance claim is a negligence claim]; *Schaeffer v. Gregory Village Partners, L.P.* (N.D. Cal. 2015) 105 F.Supp.3d 951, 967 [the elements of a private nuisance cause of action are the same as those for a public nuisance cause of action, except that a plaintiff asserting a private nuisance does not have to prove that the nuisance is one that affects a community or neighborhood and that they suffered a special injury].)

As we have discussed, plaintiffs' causation allegations fail to establish the necessary relationship (or causal link) between the alleged improper acts and/or omissions by the County Defendants and the injuries plaintiffs suffered as a result of the mass shooting committed by Neal. Among other things, plaintiffs' second and third causes of action (negligence claims) are predicated on the following conduct by the TCSO (including Sheriff Hencratt and Assistant Sheriff Johnston): (1) the failure to reasonably respond to the numerous complaints concerning Neal's possession and reckless shooting of guns in violation of the restraining orders, (2) the failure to enforce the terms of the restraining orders by arresting Neal, (3) direct and indirect communication to Neal that he could "recklessly use and/or unlawfully possess firearms without consequence," and (4) failure to properly train, supervise, hire, and discipline

29

officers for their conduct and ratifying and/or approving their unlawful and improper conduct (i.e., the pattern of inaction in response to Neal's misconduct, including the failure to obtain a search warrant to search Neal's residence and arrest him for violating the restraining orders).  Similarly, plaintiffs' fifth cause of action (public and private nuisance) is predicated on the County Defendants' failure to take any steps to stop and/or prevent the nuisance and threat caused by Neal--his shooting of guns within the community and acting violently, erratically, and in an unsafe manner towards members of the community, including threatening and assaulting members of the community. According to plaintiffs, the County Defendants "permitted the nuisance" caused by Neal to continue by actively ignoring and discouraging complaints about Neal's conduct. Plaintiffs alleged that, as a direct, proximate, and foreseeable result of the County Defendants' conduct, Elliott, Steele, and others were shot and killed or seriously injured by Neal.

For the reasons we have stated, the trial court properly sustained the County Defendants' demurrer to the second and third causes of action (negligence claims) because the operative complaint does not allege sufficient facts to establish that any act or omission by the County Defendants proximately caused the injuries alleged.  We reach the same result with respect to plaintiffs' fifth cause of action (public and private nuisance), which relies on the same facts about lack of due care as plaintiffs' negligence claims.  Under the circumstances presented, plaintiffs' nuisance cause of action has no "independent vitality" because it "merely restates" their negligence cause of action against the County Defendants " 'using a different label.' "  (*Melton, supra,* 183 Cal.App.4th at p. 543; see *id.* at p. 542 [where negligence and nuisance claims rely on the same facts about lack of due care, the nuisance claim " 'stands or falls' " with the determination of the negligence claim].)

# III

## *RTA's Demurrer*

The operative complaint alleged two causes of action against RTA--fourth (negligence) and fifth (public and private nuisance). The trial court sustained RTA's demurrer without leave to amend. As for the negligence cause of action, the court found that plaintiffs failed to adequately allege the existence of a legal duty of care. As for the nuisance cause of action, the court found (among other things) that plaintiffs failed to allege sufficient facts to establish the causation element. Plaintiffs now challenge the trial court's rulings.

A. *Fourth Cause of Action: Negligence*

### 1. *Additional Background*

Plaintiffs' fourth cause of action alleged that RTA breached its "fiduciary" duty to plaintiffs to maintain security to protect against criminal conduct and other foreseeable risks by failing to take any action in response to the numerous complaints about the danger posed by Neal, a renter of a home within the association. Among other things, the alleged danger included concerns that Neal had guns, that Neal was shooting guns within the common areas of RTA, that the TCSO was not responding to calls and action needed to be taken to obtain a greater law enforcement presence within RTA, and that Neal was acting erratically and violently towards his neighbors and other members of the community. Plaintiffs alleged that, as a direct, proximate, and foreseeable result of RTA's negligence in failing to act, Steele, Elliott, and others were shot and killed or seriously injured by Neal.

### 2. *Relevant Legal Principles*

The elements of a cause of action for negligence are "a legal duty of care, breach of that duty, and proximate cause resulting in injury." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, at p. 1158.) Recovery for negligence depends as a threshold matter on

31

whether the defendant owed a legal duty of care to the plaintiff, which is a question of law to be resolved by the court. (*Brown, supra*, 11 Cal.5th at p. 213.)

" 'California law establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others.' " (*Kesner v. Superior Court, supra*, 1 Cal.5th at p. 1142; see also *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 234-235 (*Delgado*) [as a general rule, a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous]; *Rowland v. Christian* (1968) 69 Cal.2d 108, 112 [" '[a]ll persons are required to use ordinary care to prevent others being injured as a result of their conduct' "].) Specifically, Civil Code section 1714, subdivision (a) provides, in pertinent part, that "[e]veryone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person. . . ."

One exception to the duty of care rule is that "[a]s a general matter there is no duty to act to protect others from the conduct of third parties." (*Morris v. De La Torre* (2005) 36 Cal.4th 260, 269; see also *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619 [in general, a person " 'owes no duty to control the conduct of another, nor to warn those endangered by such conduct' "].) But there are also exceptions to the exception, including that the no-duty-to-protect rule does not apply where (1) a special relationship exists between the defendant and the third person which imposes a duty upon the defendant to control the third person's conduct, or (2) a special relationship exists between the defendant and another which gives that person a right to protection. (*Zelig v. County of Los Angeles*, *supra*, 27 Cal.4th at p. 1129 [explaining that this rule derives from the common law's distinction between misfeasance and nonfeasance, and its reluctance to impose liability for the latter]; see *Delgado*, *supra*, 36 Cal.4th at p. 235 [" '[a] defendant may owe an affirmative duty to protect another from

the conduct of third parties if he or she has a 'special relationship' with the other person"].)

"A special relationship between the defendant and the victim is one that 'gives the victim a right to expect' protection from the defendant, while a special relationship between the defendant and the dangerous third party is one that 'entails an ability to control [the third party's] conduct.' " (*Brown, supra*, 11 Cal.5th at p. 216.) "The existence of such a special relationship puts the defendant in a unique position to protect the plaintiff from injury. The law requires the defendant to use this position accordingly." (*Ibid.*) A business proprietor or landlord, for example, generally owes a tenant the duty, arising out of their special relationship, to take reasonable measures to secure common areas under the landlord's control against foreseeable criminal acts of third parties that are likely to occur in the absence of such precautionary measures. (*Wiener v. Southcoast Childcare Centers, Inc*. (2004) 32 Cal.4th 1138, 1146 (*Wiener*); see *Ritter & Ritter, Inc. Pension & Profit Plan v. The Churchhill Condominium Association* (2008) 166 Cal.App.4th 103, 119-120 [homeowner associations that function as a landlord in maintaining the common areas have a duty to exercise due care for the residents' safety in those areas under their control].)

Our Supreme Court has instructed us to apply a two-step inquiry to determine "whether a defendant has a legal duty to take action to protect the plaintiff from injuries caused by a third party." (*Brown, supra*, 11 Cal.5th at p. 209.) "First, the court must determine whether there exists a special relationship between the parties or some other set of circumstances giving rise to an affirmative duty to protect. Second, if so, the court must consult the factors described in *Rowland* to determine whether relevant policy considerations counsel limiting that duty." (*Id*. at p. 209.) "While the *Rowland* factors do overlap to some degree with the considerations that determine the existence of a special relationship, application of one test does not obviate the need for the other. This is because the two tests operate differently. A court considers whether the parties have a

33

special relationship by considering the particular facts and circumstances of their association with one another. The *Rowland* factors, by contrast, consider, 'at a relatively broad level of factual generality,' whether policy considerations justify limiting any resulting duty of protection." (*Id.* at p. 221 [explaining that the purpose of the *Rowland* factors is "to determine whether the relevant circumstances warrant limiting a duty already established"].)

The two-step inquiry is based on the premise that "even when two parties may be in a special relationship, the unforeseeability of the kind of harm suffered by the plaintiff or other policy factors may counsel against establishing an affirmative duty for one party to protect another." (*Brown, supra*, 11 Cal.5th at p. 219.) "A court might conclude that duty should not be imposed because, for example, the type of harm the plaintiff suffered was unforeseeable, or because there was no moral blameworthiness associated with defendant's conduct, notwithstanding the defendant's special relationship to the plaintiff. Put differently, even when a special relationship gives rise to an affirmative duty to protect, a court must still consider whether the policy considerations set out in *Rowland* warrant a departure from that duty in the relevant category of cases." (*Id.* at p. 222; see *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213 (*Castaneda*) [finding affirmative duty based on special relationship between landlord and tenants and then analyzing *Rowland* factors to determine "duty's existence and scope"]; *Delgado, supra*, 36 Cal.4th at p. 244 [finding that special relationship between business proprietor and its tenants, patrons, and invitees imposed general duty on proprietor to take " 'reasonable steps to secure common areas against foreseeable criminal acts of third parties' " and then analyzing *Rowland* factors to determine scope of duty].)

At the second step of the two-step inquiry under *Brown*, we determine a duty's existence and scope by applying the *Rowland* factors: " '[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame

34

attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Brown, supra*, 11 Cal.5th at p. 217; *Rowland v. Christian*, *supra*, 69 Cal.2d at p. 113.)  "Foreseeability and the extent of the burden to the defendant are ordinarily the crucial considerations, but in a given case one or more of the other *Rowland* factors may be determinative of the duty analysis."  (*Castaneda, supra,* 41 Cal.4th at p. 1213 [the scope of a landlord's duty to provide protection from foreseeable third party crime is determined in part by balancing the foreseeability of harm against the burden of the duty to be imposed]; see *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 679 (*Ann M*.) [the scope of a landlord's duty to provide protection from third party crime is "determined by a balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures], disapproved on other grounds in *Reid v. Google* (2010) 50 Cal.4th 512, 527, fn. 5.)

Where the burden of preventing future harm caused by third party criminal conduct is significant or onerous--such as providing security guards, bright lighting, cameras, or stronger fencing--"heightened" or a high degree of foreseeability is required. (*Delgado, supra*, 36 Cal.4th at pp. 238-239, 243, fn. 24.)  Heightened foreseeability typically is shown by evidence of "prior similar criminal incidents" or other indications of a reasonably foreseeable risk of third party criminal conduct.  (*Id*. at pp. 243, fn. 24, 244.)  In contrast, where the harm could be prevented with minimal burden or simple means, only "reasonable foreseeability" is required.  (*Id*. at p. 243, fn. 24.)  A criminal act is reasonably foreseeable "if its occurrence is likely enough in modern daily life that reasonable people would guard against it."  (*Melton, supra*, 183 Cal.App.4th at p. 538.)

When considering whether third-party criminal acts were foreseeable, " 'the emphasis must be on the specific, rather than more general, facts of which a defendant was or should have been aware.' "  (*Melton, supra*, 183 Cal.App.4th at p. 536; see

35

*Margaret W. v. Kelley R*. (2006) 139 Cal.App.4th 141, 156-157 [on the question of duty to protect against third party criminal conduct, foreseeability of risk is measured by the danger of which defendant was or should have been aware based on facts defendant actually knew].) "With criminal conduct, an 'extraordinarily high degree of foreseeability' is necessary." (*Melton,* at p. 538.) As our Supreme Court has explained, such a heightened sense of foreseeability applies for two reasons: "[F]irst, it is difficult if not impossible in today's society to predict when a criminal might strike. Also, if a criminal decides on a particular goal or victim, it is extremely difficult to remove his every means for achieving that goal." (*Wiener, supra*, 32 Cal.4th at p. 1150.)

The duty analysis requires us "to identify the specific action or actions the plaintiff claims the defendants had a duty to undertake. 'Only after the scope of the duty under consideration is defined may a court meaningfully undertake the balancing analysis of the risks and burdens present in a given case to determine whether the specific obligations should or should not be imposed on the [defendant].' " (*Castaneda, supra*, 41 Cal.4th at p. 1214.) Thus, " '[f]irst, the court must determine the specific measures the plaintiff asserts the defendant should have taken to prevent the harm. This frames the issue for the court's determination by defining the scope of the duty under consideration. Second, the court must analyze how financially and socially burdensome these proposed measures would be to [the defendant], which measures could range from minimally burdensome to significantly burdensome under the facts of the case. Third, the court must identify the nature of the third party conduct that the plaintiff claims could have been prevented had the [defendant] taken the proposed measures, and assess how foreseeable (on a continuum from a mere possibility to a reasonable probability) it was that this conduct would occur. Once the burden and foreseeability have been independently assessed, they can be compared in determining the scope of the duty the court imposes on a given defendant.' The more certain the likelihood of harm, the higher the burden a court will impose on a [defendant] to prevent it; the less foreseeable the harm, the lower the burden

36

a court will place on a [defendant].' [Citation.] Again, other *Rowland* factors may come into play in a given case, but the balance of burdens and foreseeability is generally primary to the analysis." (*Id*. at p. 1214.)

### 3. *Analysis*

The alleged injuries were the result of Neal's intentional shooting spree in the community after he shot and killed his girlfriend. While (at least) two other victims resided within the boundaries of RTA (Steele and Elliott), these victims were shot in their front yard, not a common area of the association. There is no allegation that any other victim was shot in a common area controlled by RTA. Neal was a renter, not an owner, of a home within RTA. And there was no allegation that Neal was a member of RTA, that RTA owned the property Neal rented, or that RTA had the authority to evict Neal. Nor was there any allegation that RTA had a legal duty of care to resolve disputes between neighbors. (See *Woolard v. Regent Real Estate Services, Inc*. (2024) 107 Cal.App.5th 783, 792-794 [declining to recognize a duty of care requiring a homeowners association to involve itself in alleged harassment (including verbal and physical disputes) between neighbors/homeowners that escalated to a physical altercation, noting that it was not aware of any case holding that a homeowners association has a duty of care to mediate, deescalate, or resolve disputes between neighbors].) Instead, the operative complaint alleged facts suggesting the existence of a special relationship because RTA was the functional equivalent of a landlord, as the homeowners association was "formed to provide for maintenance, preservation and control of the residence Lots and Common Area of Rancho Tehama covered by the Association, and to promote the health, safety and welfare of the residents within that property, including the duties of maintenance, management, upkeep and repair of all of the Common Area and all facilities of Rancho Tehama Association neighborhoods." According to the operative complaint, RTA had "a fiduciary duty to Plaintiffs and their loved ones to *maintain security* in the premises and common areas of the Association premises, against criminal

37

conduct and other foreseeable risks of injury."**4** (Italics added.) Thus, plaintiffs' negligence claim is predicated on RTA's failure to take protective measures to avert the harm caused by Neal's intentional shooting of numerous people, including several people residing within RTA.

Even assuming plaintiffs adequately alleged the existence of a special relationship akin to a landlord/tenant relationship, the *Rowland* factors, as we next explain, support the conclusion that Neal's intentional shooting of his neighbors (and subsequent shooting spree throughout the community) was not sufficiently foreseeable to impose a duty upon RTA to provide security guards. Our Supreme Court has held that "a high degree of foreseeability is required in order to find that the scope of a landlord's duty of care includes the hiring of security guards," and stressed further that "the requisite degree of foreseeability rarely, if ever, can be proven in the absence of prior similar incidents of violent crime on the landowner's premises." (*Ann M., supra*, 6 Cal.4th at p. 679 [the landlord must be on notice, having *particularized information*, of prior similar incidents that occurred on the property]; *Melton, supra*, 183 Cal.App.4th at p. 539 ["The California Supreme Court has repeatedly found 'the burden of hiring security guards' to be 'extremely high' "].) "To hold otherwise," *Ann M*. emphasized, "would be to impose an

---

**4** In their opposition to RTA's demurrer, plaintiffs identified various measures RTA should have taken to prevent the harm inflicted by Neal, including the hiring of security guards and taking steps to have Neal evicted. At oral argument on the demurrers, plaintiffs claimed that RTA had the authority--pursuant to certain covenants, conditions, and restrictions (CC&R's) that applied to members of RTA--and duty to evict Neal from his home. But the operative complaint did not allege any facts showing that RTA had such authority. And plaintiffs never requested leave to amend to add facts alleging that RTA had the authority to evict Neal. In reviewing an order sustaining a demurrer, our task is to determine whether the operative complaint alleges sufficient facts to state a cause of action under and valid theory. (*Fierro v. Landry's Restaurant Inc*. (2019) 32 Cal.App.5th 276, 286.) In doing so, we do not (as noted *ante*) consider "extraneous facts" not set forth in the pleading. (*Yamaha Motor Corp. v. Paseman*, *supra*, 219 Cal.App.3d at p. 963, fn. 2.)

unfair burden upon landlords and, in effect, would force landlords to become the insurers of public safety, contrary to well-established policy in this state." (*Ann M.,* at p. 679.)

Because the duty to maintain security guards adequate to have prevented the violent crimes committed by Neal would have imposed a significant (or onerous) burden on RTA, plaintiffs must point to allegations in the operative complaint that sufficiently allege a high degree of foreseeability of such third party criminal conduct. (See *Ann M.*, *supra*, 6 Cal.4th at p. 679.) The pleading, however, does not allege that RTA was aware of any *specific*, prior similar incidents of violence by Neal or members of RTA, the key indicator of heightened foreseeability required to establish a duty to provide security guards. (See *Delgado, supra*, 36 Cal.4th at p. 245 ["Heightened foreseeability is satisfied by a showing of prior *similar* criminal incidents (or other indications of a reasonably foreseeable risk of violent criminal assaults in that location) and does not require a showing of prior *nearly identical* criminal incidents."]; *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, at pp. 1190-1191 [prior purse snatchings, bank robberies, and the "statistical crime rate" of the area surrounding a parking garage did not establish foreseeability of a sexual assault]; *Ann M., supra*, 6 Cal.4th at pp. 679-680 [evidence of prior assaults and robberies did not establish foreseeability of a rape]; *Williams v. Fremont Corners, Inc.* (2019) 37 Cal.App.5th 654, 668-669 [retail shopping center owner's general knowledge of *possibility* of violent criminal conduct on premises was not itself enough to create duty to provide protection from foreseeable third party crime to musician assaulted in parking lot upon leaving bar where he performed].)

Here, the operative complaint alleged that numerous reports were made to RTA about the danger posed by Neal, including that he was shooting guns within the common areas of RTA, that the TCSO was not responding to calls and steps needed to be taken to ensure a greater "Sheriff presence" within the boundaries of the association, and that Neal was "causing numerous issues and acting erratically and violently toward his neighbors." The pleading further alleged that, in November 2016 and (again) in November 2017,

39

RTA sent a letter to Neal advising him that it had received numerous complaints about the constant shooting of guns on his property and the constant yelling and screaming coming from his home. The November 2016 letter also noted that RTA had received reports of Neal constantly threatening neighbors, although there is no mention of any specific threat Neal made. Both of RTA's letters advised Neal that "reports" had been filed with the TCSO. While the operative complaint generally alleged that RTA was informed that "crimes" were being committed by Neal, and that Neal posed a "danger" to members of RTA, it does not allege that RTA was aware of any *specific* incidents of violence by Neal, including the incident in January 2017 (i.e., approximately 10 months before the mass shooting) that gave rise to the criminal protective order against Neal. There is no allegation that RTA was aware of the restraining orders issued against Neal for the protection of Steele, Elliott, and other members of Steele's family.

In short, the operative complaint is devoid of allegations supporting the conclusion that, based on the facts known by RTA, it was highly foreseeable that Neal would shoot and kill several of his neighbors and then embark on a shooting rampage throughout the community in November 2017. Neal's intentional shooting spree was not sufficiently foreseeable to impose the significant burden upon RTA to provide security guards to protect against violent crimes within the boundaries of RTA. Because plaintiffs have failed to allege sufficient facts to establish the high degree of foreseeability necessary to impose a legal duty upon RTA to take the highly burdensome measure of providing security guards, we need not consider the other *Rowland* factors. (See *Hanouchian v. Steele* (2020) 51 Cal.App.5th 99, 113; *Delgado, supra*, 36 Cal.4th at p. 237, fn. 15 [noting the most important *Rowland* factor in establishing duty is foreseeability].) In the absence of a legal duty of care, no negligence claim can be stated against RTA. (*Wiener, supra,* 32 Cal.4th at p. 1145.) Accordingly, the trial court properly sustained RTA's demurrer to the fourth cause of action.

We are unpersuaded by plaintiffs' contention that a different result is warranted because the operative complaint sufficiently alleged facts establishing that RTA had a legal duty to take reasonable steps to prevent Neal's dangerous behavior from continuing. In making this argument, plaintiffs suggest that RTA had a duty to take reasonable steps (or minimally burdensome security measures), such as warning members and other residents living within the association about Neal's dangerous behavior, reporting Neal's dangerous behavior to law enforcement, and/or "us[ing] civil legal channels to abate [Neal's] dangerous behavior." But plaintiffs never specifically alleged as much in the operative complaint. That is, plaintiffs never identified these specific measures as security precautions RTA should have taken to avoid the mass shooting committed by Neal. This is problematic for plaintiffs because the specific precautionary measures a plaintiff asserts the defendant should have taken to prevent the harm are what define the scope of the duty under consideration. (*Castaneda, supra*, 41 Cal.4th at p. 1214.)

Further, plaintiffs have failed to explain how the shootings would have been prevented had RTA taken the proposed measures, one of which--reporting Neal's dangerous behavior to law enforcement--*was* undertaken by RTA on at least two occasions before the mass shooting. (See *Ann M., supra*, 6 Cal.4th at p. 679 [reviewing court determines duty by balancing " 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures"]; *Castaneda, supra*, 41 Cal.4th at p. 1214 [in determining the scope of the duty to be imposed on the defendant, we analyze the burden of the proposed measures to the landowner and assess how foreseeable was the third-party conduct that the plaintiff claims could have been prevented had the landlord taken the proposed measures].) In light of our Supreme Court's observation that the hiring of security guards imposes a significant cost for a "not well defined" deterrence benefit (*Ann M.,* at p. 679), we conclude that plaintiffs' proposed measures have even more of an attenuated relationship to preventing the type of harm they suffered as a result of Neal's shooting rampage.

41

Because "[f]oreseeability and the extent of the burden to the defendant are ordinarily" considered the "crucial" considerations in evaluating legal duty (*Castaneda,* at p. 1213), we need not and do consider the remaining *Rowland* factors.

We find plaintiffs' reliance on *Barber v. Chang* (2007) 151 Cal.App.4th 1456 and *Madhani v. Cooper* (2003) 106 Cal.App.4th 412 misplaced. Both of these cases involve a violent assault of a tenant or invitee after the landlord of an apartment complex had actual notice that the specific tenant or invitee had been threatened and/or assaulted by another tenant/perpetrator. As we have explained, this is nothing like the situation before us. Similarly, the remainder of plaintiffs' cited cases in this area involve drastically different scenarios than that before us, and thus are unhelpful for reasons we have already explained.[5]

B. *Fifth Cause of Action: Public and Private Nuisance*

Plaintiffs argue the trial court erred in sustaining RTA's demurrer to the fifth cause of action (public and private nuisance), which alleged that RTA failed to take any steps to stop and/or prevent the nuisance and threat caused by Neal--his shooting of guns and acting violently, erratically, and aggressively towards members of the association, including threatening and assaulting members of the association. According to plaintiffs, RTA "permitted the nuisance" by "actively" ignoring and discouraging complaints about Neal's conduct. Plaintiffs alleged that, as a direct, proximate, and foreseeable result of RTA's conduct, Steele and Elliott were shot and killed by Neal.

---

[5] The negligence cause of action against RTA also fails for a separate, independent reason--lack of proximate cause. Even assuming RTA had a duty to undertake the precautionary measures identified by plaintiffs, the allegations in the operative complaint fail to establish a causal link between RTA's failure to implement those measures (or adequately implement with respect to reporting Neal's behavior to the TCSO) and the injuries alleged. (*Kumaraperu*, *supra*, 237 Cal.App.4th at p. 68 [for "causation in fact," the conduct must be a "substantial factor" bringing about harm that "is 'recognizable as having an appreciable effect in bringing it about' "].)

42

Under the circumstances presented, plaintiffs' nuisance cause of action has no "independent vitality" because it "merely restates" plaintiffs' negligence cause of action against RTA " 'using a different label.' " (*Melton, supra,* 183 Cal.App.4th at p. 543; see *id*. at p. 542 [where negligence and nuisance claims rely on the same facts about lack of due care, the nuisance claim " 'stands or falls' " with the determination of the negligence claim].)  Plaintiffs, for their part, do not dispute that their nuisance cause of action is based on the same factual allegations as their negligence cause of action.  Instead, they argue reversal is required because, like their negligence cause of action, the operative complaint alleged sufficient facts to state an actionable nuisance cause of action.  As we have explained, we disagree.  Accordingly, the trial court properly sustained the demurrer to the fifth cause of action as to RTA.

IV

*Leave to Amend*

As set forth *ante*, when a demurrer is sustained without leave to amend, we must decide whether there is a reasonable possibility that the defect can be cured by amendment.  (*Blank v. Kirwan, supra*, 39 Cal.3d at p. 318.)  The plaintiff bears the burden to show that reasonable possibility.  (*Schifando v. City of Los Angeles*, *supra*, 31 Cal.4th at p. 1081.)  That burden requires the plaintiff to specifically show what facts he/she could plead to state valid causes of action if allowed the opportunity to amend.  (*Cantu v. Resolution Trust Corp*. (1992) 4 Cal.App.4th 857, 890.)  To meet that burden on appeal, the plaintiff must "enumerate the facts and demonstrate how those facts establish a cause of action.  [Citations.]  Absent such a showing, the appellate court cannot assess whether or not the trial court abused its discretion by denying leave to amend." (*Ibid*.)

Plaintiffs make no effort on appeal to demonstrate how the operative complaint could be amended to allege facts sufficient to state a valid cause of action against the County Defendants or RTA.  As a result, they have failed to meet their burden of

43

showing the trial court abused its discretion in denying them leave to amend.  (See *Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 44 [where "the appellant offers no allegations to support the possibility of amendment and no legal authority showing the viability of new causes of action, there is no basis for finding the trial court abused its discretion when it sustained the demurrer without leave to amend"].)  Accordingly, we conclude the trial court did not abuse its discretion sustaining the demurrers without leave to amend.

## DISPOSITION

The judgment is affirmed.  The County Defendants and RTA are entitled to recover their costs on appeal.  (California Rules of Court, rule 8.278(a).)


_____/s/_____
Duarte, J.

We concur:


_____/s/_____
Mauro, Acting P. J.


_____/s/_____
Wiseman, J.*

_____

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.